822 F.2d 430
 125 L.R.R.M. (BNA) 2976
 U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, Petitioner,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent,
American Federation of Government Employees, AFL-CIO, Local
1923, Intervenor.
 No. 86-2619.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 4, 1987.
Decided June 23, 1987.
Rehearing En Banc Granted Sept. 23, 1987.
 
 Harold K. Krent, Civ. Div., Dept. of Justice (Richard K. Willard, Asst. Atty. Gen., William Kanter, Civil Div., Dept. of Justice, Washington, D.C., on brief), for petitioner.
 Ruth E. Peters, Sol. (William E. Persina, Deputy Sol., Arthur A. Horowitz, Associate Sol., Robert J. Englehart, Federal Labor Relations Authority, Washington, D.C., on brief), for respondent.
 Stuart A. Kirsch, American Federation of Government Employees, AFL-CIO (Mark Roth, Gen. Counsel, Washington, D.C., on brief), for intervenor.
 Before WINTER, Chief Judge, and MURNAGHAN and WILKINSON, Circuit Judges.
 MURNAGHAN, Circuit Judge:
 
 
 1
 The United States Department of Health and Human Services (HHS) has petitioned for review of a Federal Labor Relations Authority ("FLRA") decision ordering HHS to bargain over a proposal by the American Federation of Government Employees (the "Union"). The proposal would require HHS to comply with OMB Circular A-76[1] (the "Circular") when making "contracting-out" decisions. HHS contends that it has no duty to bargain because the proposal concerns a subject exclusively reserved to management. The FLRA has cross-petitioned for enforcement, and the union intervened on the FLRA's behalf. We enforce the FLRA's order because the Union's proposal does not usurp the authority reserved to management under 5 U.S.C. Sec. 7106.
 
 I. Facts and Proceedings Below
 
 2
 During contract negotiations between HHS and the Union, which represents clerical employees in the office of HHS General Counsel in Baltimore, the Union proposed the following provision:
 
 
 3
 The decision by the employer to contract out work presently being performed by bargaining unit employees will be made in accordance with OMB Circular A-76 (unless application of the Circular is prohibited or not required by the Circular).
 
 
 4
 After negotiations, an HHS agency head reviewing the proposal refused to approve it on the grounds that, if the proposed provision became part of the collective bargaining agreement, it would violate: (1) the management rights clause of the Act, which bars negotiation over proposals limiting management's power to make determinations with respect to contracting-out work, 5 U.S.C. Sec. 7106(a)(2)(B); and (2) 5 U.S.C. Sec. 7117(a)(1), which precludes bargaining over proposals that would create an inconsistency with any federal law or government-wide regulation. The Union petitioned the FLRA to review HHS's determination that the proposed provision was nonnegotiable. The FLRA determined that the proposed provision was negotiable, because it was not inconsistent with management's right under section 7106 of the Act to make determinations with respect to contracting-out or with applicable law or regulations. See American Federation of Government Employees, AFL-CIO, Local 1923 and Department of Health and Human Services, 22 FLRA No. 106, at 6 (1986).
 
 
 5
 HHS filed a motion for reconsideration, dated October 1, 1986, of the FLRA's July 31, 1986 decision. In the motion HHS argued for the first time that the Circular is not an "applicable law" for purposes of section 7106(a)(2) of the Act and that it is not a "law, rule or regulation affecting conditions of employment," the violations of which can be resolved in accordance with sections 7103(a)(9) and 7121(a), through the negotiated grievance procedure. The FLRA denied the HHS motion for reconsideration as untimely, noting that under FLRA rules (5 C.F.R. Sec. 2429.17) a motion for reconsideration is due within ten days of the FLRA decision in a particular case. This appeal followed. We have jurisdiction pursuant to 5 U.S.C. Sec. 7123[2] over the issues raised in the Union's original petition to the FLRA and discussed in the FLRA's July 31, 1986 decision. As discussed in part D of this opinion, however, we have no jurisdiction over the issues HHS raised for the first time in its October 1, 1986 motion for reconsideration.
 
 II. Standard of Review
 
 6
 The Act provides that the FLRA's decisions are reviewable in accordance with section 10(e) of the Administrative Procedure Act, 5 U.S.C. Sec. 706 (1982). See 5 U.S.C. Sec. 7123(c) (1982). The scope of our review "is limited to whether the agency's [action] is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." United States Army Engineer Center v. FLRA, 762 F.2d 409, 414 (4th Cir.1985). Furthermore,
 
 
 7
 [T]he authority is entitled to considerable deference when it exercises its special function of applying the general provisions of the Act....
 
 
 8
 On the other hand, the deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress ... Accordingly, while reviewing courts should uphold reasonable and defensible constructions of an agency's enabling Act ... they must not rubber stamp ... administrative decisions that frustrate the congressional policy underlying a statute.
 
 
 9
 Bureau of Alcohol, Tobacco and Firearms v. FLRA, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983).
 
 
 10
 Thus, the FLRA's decision should be upheld if it is reasonably defensible, Id., and not inconsistent with any congressional mandate or policy. EEOC v. FLRA, 744 F.2d 842, 847 (D.C.Cir.1984), cert. dismissed, --- U.S. ----, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986). On the other hand, enforcement of the decision should be denied if the decision is contrary to congressional intent.
 
 III. Discussion
 
 11
 Title VII of the Civil Service Reform Act of 1978 (the Act), 5 U.S.C. Secs. 7101-7135 (1982) established a collective bargaining system to govern labor-management relations in the federal sector. Under the act, federal agencies and employee unions are required to bargain in good faith over "Conditions of employment." 5 U.S.C. Sec. 7103(a)(12). The term "Conditions of employment" is defined in the Act as "personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions." 5 U.S.C. Sec. 7103(a)(14).
 
 
 12
 The duty to bargain is limited by a management rights clause contained in the Act. 5 U.S.C. Sec. 7106(a). In particular, the management rights clause provides that management has the authority "in accordance with applicable laws ... to make determinations with respect to contracting out." 5 U.S.C. Sec. 7106(a)(2)(B). The procedures used in exercising these rights, however, are subject to negotiation.[3]
 
 
 13
 HHS argues that the management's rights clause gives management complete discretion in making contracting-out decisions. HHS points to the introductory language of the clause which states that "subject to subsection (b) of this section nothing" in Title VII "shall effect the authority of any management official of any agency" to make decisions reserved to management. 5 U.S.C. Sec. 7106(a). The FLRA itself has recognized that the Act reserves to management as nonnegotiable the substantive exercise of its authority to make contracting-out determinations. NFFE, Local 1167 and Department of the Air Force, Headquarters, 31st Combat Support Group (TAC), Homestead Air Force Base, Florida, 6 F.L.R.A. 574 (1981), aff'd sub nom. NFFE, Local 1167 v. FLRA, 681 F.2d 886 (D.C.Cir.1982).
 
 
 14
 We believe the proposed provision would not establish any additional substantive limits on management's right to make contracting-out decisions. The FLRA found that HHS is required to adhere to the provisions of the Circular regardless of whether the Union's proposal is adopted as part of the collective bargaining agreement. The Union's proposal simply restates HHS's obligation to adhere to existing legal and regulatory requirements. Before this court, in fact, counsel for HHS indicated that the Department intends to comply with the Circular in making any contracting-out decisions. As a result, we agree with the FLRA's conclusion that the Union's proposal would not impair HHS's statutory right to make contracting-out decisions "in accordance with applicable laws."
 
 
 15
 Incorporating the Circular into the collective bargaining agreement would subject disputes over violations of the Circular to the arbitration procedures contained in the Act. 5 U.S.C. Sec. 7103(a)(9)(C)(i). Subjecting such disputes to arbitration does not render the Union's proposal nonnegotiable for two reasons. First, the management rights clause exempts from its coverage any bargaining proposal concerning procedures governing agency contracting-out decisions. Second, contracting-out decisions are currently subject to grievance arbitration under section 7121 of the Act. We will discuss those issues seriatim.
 
 A.
 
 16
 HHS asserts that adoption of the Union's proposal would permit arbitral review of HHS's contracting-out decisions, and that such review would adversely affect the exercise of management's contracting-out authority.[4] This argument overlooks section 7106(b) of the Act. Arbitration is a procedure, and management's authority to contract-out under section 7106(a) of the statute is "[s]ubject to" section 7106(b)(2), which provides for the negotiation of procedures which management will observe in exercising its right to contract-out. 5 U.S.C. Sec. 7106(b)(2) HHS, while admitting that subjecting management's contracting-out decisions to arbitral review is procedural in nature, contends that such review will have a substantive effect, because management will be forced to consider the potential impact of arbitration before making its contracting-out decisions.
 
 
 17
 The Ninth Circuit adopted HHS's position in Defense Language Institute v. FLRA, 767 F.2d 1398 (9th Cir.1985), cert. dismissed, --- U.S. ----, 106 S.Ct. 2004, 90 L.Ed.2d 647 (1986), and the D.C. Circuit adopted the FLRA's view that the proposed provision is a negotiable procedure. EEOC v. FLRA, 744 F.2d 842. In Defense Language Institute, the court maintained that subjecting contracting-out disputes to arbitration would "divest management of the essence of its statutory authority to contract-out" because arbitration would allow the neutral arbitrator to second guess the business judgment of management officials. 767 F.2d at 1401-02.
 
 
 18
 The Ninth Circuit's position, whatever its surface appeal, is ultimately unpersuasive. An arbitrator's ability to substitute his judgment for that of management is determined by the substantive standards for review and not by the mere fact that management's decision is subject to review. The arbitrator is not entitled to substitute his judgment for that of management when management's decision is a matter of discretion. AFGE, Local 1968 v. FLRA, 691 F.2d 565 (D.C.Cir.1982), cert. denied, 461 U.S. 926, 103 S.Ct. 2085, 77 L.Ed.2d 297 (1983); NTEU v. FLRA, 767 F.2d 1315, 1317-18 (9th Cir.1985). In addition, if the Executive Department does not like the substantive limits imposed by arbitrators interpreting the Circular, it may change those limits by amending its own Circular. Also, in the event an arbitrator exceeds his authority, management may take exception to the arbitrator's decision to the FLRA for review. 5 U.S.C. Sec. 7122. See, e.g., Blytheville Air Force Base, 22 FLRA No. 72 (1986). Finally, judicial review is available in the event an arbitrator imposes a limitation on management authority which is not "in accordance with applicable laws." 5 U.S.C. Sec. 7123.[5]
 
 
 19
 Our holding that a Union's proposal which would authorize arbitration of disputes over the Circular is negotiable under section 7106(b)(2) of the Act is consistent with Congress' intention in adopting Title VII of the Civil Service Reform Act. The Act was adopted with the twin goals of expanding the right of collective bargaining and preserving the ability of the federal government to operate in an efficient manner. Defense Language Institute v. FLRA, 767 F.2d at 1401. The Ninth Circuit found that subjecting management rights to the decision of a neutral arbitrator would unduly interfere with the efficient operation of government.
 
 
 20
 The Ninth Circuit's interpretation of Title VII of the Act ignores the delicate compromise which allowed the Act to be passed by Congress. The final version of the management rights provision of Title VII was added to the Act on the floor of the House through a compromise measure offered by Representative Udall, the floor manager of the bill, as a result of the demands of promanagement forces.[6] Labor sympathizers acceded to the demand for inclusion of the measure in return for the understanding that the rights "were a narrow exception to the general obligation to bargain in good faith." 124 Cong.Rec. H 9638 (1978), reprinted in Legislative History at 1059 (Statement of Rep. Udall).[7] Congress intended Title VII to remedy the past problem of the Federal Labor Relations Council's (Council) overbroad interpretation of management rights.[8] Congress expressed this intention in the Act by enumerating the management rights protected by the Act as exceptions to the general duty to bargain and by providing that Title VII and decisions of the new FLRA would supersede the Council's decisions which were anathema to organized labor. 5 U.S.C. Secs. 7106 and 7135.[9] Representative Udall who forged the compromise measure, and the prolabor forces which supported the bill, emphasized that without acceptance of a canon of construction narrowly interpreting the scope of management rights, the bill would not be acceptable to a majority of Congress.
 
 
 21
 The whole structure and approach of title VII is in large part a repudiation of past Council practice. If we could not have been assured that identical language for management rights would be handled differently under the narrow construction mandated by title VII, the Udall compromise would never have been possible.
 
 
 22
 Legislative History, at 1060 (Statement of Rep. Udall).[10]
 
 
 23
 The canon of construction which must guide resolution of the instant case, therefore, is that the management rights clause must be "treated narrowly as an exception to the general obligation to bargain over conditions of employment." 124 Cong. Rec. H9634 (1978) (Statement of Rep. Udall) reprinted in Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978, 96th Cong., 1st Sess., 924 (Subcomm. Print November, 1979) (hereinafter cited as Subcomm. Legislative History). Therefore,
 
 
 24
 only bargaining proposals which [are] directly related to the actual exercise of the enumerated management rights are to be ruled nonnegotiable. An indirect or secondary impact on a management right is insufficient to make a proposal nonnegotiable ... That the conference committee adopted this approach is reflected in the statement of managers that, in negotiations, "the parties may indirectly do what the (management rights) section prohibits them from doing directly."
 
 
 25
 Legislative History, at 2008 (Statement of Rep. Ford).[11] Management was unable to change this aspect of federal labor relations through the legislative process. This court will not grant to management the protection that management was unable to secure from Congress.[12]
 
 
 26
 Under the applicable canon of construction, arbitration of a management right according to the substantive standards established by management is clearly a procedural proposal under Title VII. Any effect arbitration may have on management rights is only indirect. Thus, the FLRA is correct in its "conclusion that the proposal does not affect management's reserved authority, within the meaning of the statutory language, to make contracting-out decisions." EEOC v. FLRA, 744 F.2d at 848.
 
 B.
 
 27
 We agree with the FLRA's finding that arbitration of disputes involving application of the Circular would be in accordance with applicable laws because section 7121 of the Act already subjects disputes over contracting-out work to the Act's grievance procedures. That provision states: "Except as provided in paragraph (2) of this subsection, any collective bargaining agreement shall provide procedures for the settlement of grievances ..." 5 U.S.C. Sec. 7121(a)(1). A grievance is elsewhere defined as "any complaint" by any employee or labor organization "concerning any matter relating to the employment of the employee" or by any employee, labor organization, or agency concerning "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation, affecting conditions of employment" 5 U.S.C. Sec. 7103(a)(9). Moreover, contracting-out is not enumerated in the five specific exemptions that Congress granted from the permissible scope of the grievance procedure. Id., at Sec. 7121(c). In light of the expansive coverage of this section, the FLRA found that the proposed collective bargaining provision did not infringe on contracting-out decisions because such decisions were already subject to arbitration.
 
 
 28
 There is a problem with the FLRA's view. The management rights provision and the grievance provision of the Act contradict each other. Section 7106 states that "nothing in this chapter shall affect the authority of any management official ... in accordance with applicable laws ... to make determinations with respect to contracting out." 5 U.S.C. Sec. 7106(a). If applicable law includes section 7121, then section 7106 in effect reads: "nothing in this chapter except all the other provisions of Chapter 71, including Sec. 7121 ... shall affect the authority of any management official of any agency ... to make determinations with respect to contracting out." See EEOC v. FLRA, supra, 744 F.2d at 857 (MacKinnon, J., dissenting). Thus, under the FLRA's view of the statute, the clause of section 7106 stating "nothing in this chapter" becomes essentially meaningless because it is modified by the phrase in accordance with applicable laws which includes the provisions of "this chapter."
 
 
 29
 A similar problem is encountered, however, if the nonnegotiability provisions of section 7106 are found to restrict the grievance provisions contained in section 7121. Section 7121 states: "Except as provided in paragraph (2) of this subsection, any collective bargaining agreement shall provide procedures for the settlement of grievances." If section 7106 restricts the scope of section 7121 by excluding grievances relating to management's exercise of its reserved rights from the section's coverage, then section 7121 in effect reads: "Except as provided in paragraph (2) of this subsection and in section 7106 of this chapter...." Thus, under the Ninth Circuit and HHS view of the statute, the clause of section 7121 stating "except as provided in paragraph (2)" cannot be given its plain meaning because section 7121 is limited not only by paragraph (2) but by section 7106 as well.
 
 
 30
 When Congress' plain language does not convey its intention, the court "must not be guided by a single sentence or member of a sentence, but [must] look to the provisions of the whole law and to its object and policy." Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 285, 76 S.Ct. 349, 359, 100 L.Ed. 309 (1956).[13] The Civil Service Reform Act of 1978 was enacted by Congress at a time when federal labor policy had established a preference for arbitration of labor disputes.[14] Federal labor law had declared that arbitration of provisions restricting or regulating the exercise of management functions was not to be considered a forbidden infringement on management rights unless the parties presented "the most forceful evidence" that they intended to exclude a specific management function from arbitration. United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 584-85, 80 S.Ct. 1347, 1353-54, 4 L.Ed.2d 1409 (1960). If Congress expected to reverse this fundamental tenet of federal labor policy, it was obligated to set forth its intention explicitly within the new Act. Congress' failure to do so impliedly accepts the preference for arbitration.
 
 
 31
 Indeed, Title VII of the Act was adopted against a background not of unbounded management rights, but of collective bargaining rights which were previously established by Executive Order 11491. Subcomm. Legislative History, at 1244-57. Under the Executive Order 11491 employee grievances involving disputes over employment conditions were subject to arbitration even if they involved nonnegotiable areas of management rights. Report of the Federal Labor Relations Council, Subcomm. Legislative History, at 1260-61. Title VII incorporated most of the provisions of Executive Order 11491 into law, but with several substantive changes. These changes resulted through delicate negotiations between the competing labor and management interests which are affected by the Act. The changes did not include a provision altering the practice of subjecting nonnegotiable management rights to arbitration procedures. If those interests were unable to incorporate explicitly a change in the Executive Order which formed the foundation of the Act, then such a change should not be implied into the deal that was struck within the legislative process.
 
 
 32
 The legislative history of Title VII of the Act also explicitly indicates that arbitration of nonnegotiable management rights was possible under Sec. 7121. The broad definition of grievance in Sec. 7103(a)(9) was put into the Act by the Conference members so that
 
 
 33
 So long as a rule or regulation "affects conditions of employment", infractions of that rule or regulation are fully grievable, even if the rule or regulation implicates some management right. This interpretation of the definition is required both by the express language of the section and by the greater priority given the negotiability of procedures over the right of management to bar negotiations because of a retained management right.
 
 
 34
 124 Cong.Rec. H 13609, reprinted in Legislative History at 2012 (Statements of Rep. Ford) (emphasis supplied). In addition, during the house debates on the Udall compromise amendment to the Act, it was explained that the management rights provisions of the Act would "in no way affect the employee's right to appeal the decision[§ of management] through statutory procedures or, if applicable, through procedures set forth in a collective bargaining agreement," because such decisions were to be made in accordance with applicable laws. Id. at 1050 (Statement of Rep. Udall).[15] Representative Udall further stated that the management rights section was:
 
 
 35
 still to be treated narrowly as an exception to the general obligation to bargain over conditions of employment ... [This amendment] preserves management's right to make the final decisions in these additional areas in accordance with applicable laws, including other provisions of chapter 71 of title 5.[16] For example, management has the reserved right to make the final decision to 'remove' an employee; but that decision ... would in no way affect the employee's right to appeal the decision through ... the procedures set forth in a collective bargaining agreement.
 
 
 36
 124 Cong.Rec. H9634 (1978) reprinted in Subcomm. Legislative History at 924.
 
 
 37
 There is nothing in the legislative history indicating that Congress intended that the reserved management rights listed in section 7106(a) be beyond the Act's grievance procedure. In fact, as shown above, the Act's legislative history clearly demonstrates Congress's intention that any contradiction between sections 7121 and 7106 be resolved in favor of the employee's right to grieve issues affecting management rights. Thus, we hold that a designated management right which is nonnegotiable is grievable under the Act's negotiated grievance procedure.[17]
 
 C.
 
 38
 The duty to bargain exists only "to the extent not inconsistent with any Federal law or any Government-wide rule or regulation." 5 U.S.C. Sec. 7117(a)(1). The Circular provides that its provisions "shall not be construed to create" any right of appeal except as provided in the Circular itself. HHS argues that the FLRA's ruling, that the Union's proposal is negotiable, is in conflict with the Circular because the ruling subjects agency contracting-out decisions to the Act's grievance procedures. We disagree.
 
 
 39
 HHS's argument can be rejected for two reasons. First, the Union's proposal does not create any new right of appeal, because, as discussed above, the right to file grievances regarding contracting-out decisions is created by the Act. 5 U.S.C. Secs. 7103(a)(9) and 7121(a).[18] Second, even assuming there is an inconsistency between the Act's grievance procedures and the Circular's appeal procedures, there is no indication that Congress intended agencies to limit by regulation the statutorily defined grievance procedure of section 7121. EEOC v. FLRA, 744 F.2d at 851.
 
 
 40
 The Act's legislative history makes clear that Congress intended that section 7117(a)(1) only bar negotiation over proposals that would bring about inconsistencies with law, rule, and regulation. H.R.Conf.Rep. 95-1717, 95th Cong., 2d Sess. 158 (1978), U.S.Code Cong. & Admin.News 1978, p. 2723, reprinted in Subcomm. Legislative History at 826. Thus, if a proposal's only inconsistency with a rule or regulation concerns grievance procedures, then section 7117(a)(1) would not bar negotiation of the proposal. The primary concern of the "not inconsistent with any ... law ... rule or regulation" clause of section 7117(a)(1) is with inconsistencies which would interfere with management's substantive rights. The Circular's appeals procedure does not affect the guidelines management must follow when making a contracting-out decision. Therefore, section 7117(a)(1) is not a bar to negotiation of the Union's proposal.
 
 D.
 
 41
 HHS next argues that the Circular is not a law, rule, or regulation within the meaning of section 7103(a)(9) and is not an applicable law within the meaning of section 7106. In EEOC v. FLRA, 476 U.S. 19, 106 S.Ct. 1678, 1680, 90 L.Ed.2d 19 (1986), the Supreme Court refused to reach or resolve the identical issue, because the issue had not been argued before the FLRA or the Court of Appeals. The Court stated that the Act "expressly provides that when an aggrieved party seeks judicial review of a final order of the FLRA '[n]o objection that has not been argued before the Authority, or its designee, shall be considered by the court, unless the failure or neglect to urge the objection is excused because of extraordinary circumstances.' 5 U.S.C. Sec. 7123(c)." EEOC v. FLRA, 106 S.Ct. at 1680. This court will not now consider the issue for the same reasons.
 
 
 42
 HHS filed its Statement of Position with the FLRA on January 17, 1986 and did not raise the above argument. The Supreme Court's decision in EEOC v. FLRA was issued on April 29, 1986. Three months later on July 31, 1986 the FLRA rendered its decision in the instant matter. It was not until October 1, 1986 that HHS filed a "Motion to Reconsider" in light of EEOC v. FLRA. The "Motion to Reconsider" was denied as untimely because such motions are required to be filed within 10 days after service of an FLRA order. 5 C.F.R. Sec. 2429.17.
 
 
 43
 There are no extraordinary circumstances warranting this court's consideration of the above issue. HHS had three months after the Supreme Court's EEOC decision to supplement its statement of position, but failed to do so. Furthermore, after the FLRA decision, HHS waited two months to file for reconsideration. Since the above argument was not timely presented to the FLRA, according to section 7123(c) of the Act, it is not within the jurisdiction of this court to consider the argument now.[19]
 
 IV. Conclusion
 
 44
 For the reasons stated herein, we conclude that the FLRA's decision that the Union's proposal is negotiable, should be upheld and its order should be enforced.
 
 
 45
 ENFORCED.
 
 HARRISON L. WINTER, Chief Judge, concurring:
 
 46
 I concur fully in Judge Murnaghan's well reasoned opinion. I add these few comments merely to clarify the major point of disagreement between the majority opinion and our dissenting brother. As the majority opinion explains, the management rights provision of Title VII of the Civil Service Reform Act resulted from an amendment on the House floor known as the Udall compromise. This compromise provision called for a narrow construction of the management rights provision of the Act which bars only those bargaining proposals directly related to the actual exercise of enumerated management rights. The majority opinion's interpretation of the Act consequently narrowly construes the managements rights provision to allow arbitration of preexisting substantive rules because arbitral procedures can only indirectly affect these preexisting rights.
 
 
 47
 Our dissenting brother entirely ignores the Udall compromise adopted by the 1978 Act which mandates this narrow construction of the management rights provision of the Act. Instead, for policy reasons set forth in that opinion, the dissent adopts a broad construction of these rights which, if it had been included in the bill considered by Congress, would have discarded an essential feature of the compromise measure proposed by Representative Udall and caused the Congress to reject the entire Act. The dissent's scant references to the legislative record emphasizes its reliance on its own views of proper government policy.
 
 
 48
 The dissent does quote from Representative Ford from the Congressional debate, but that statement, instead of supporting a broad construction of the management rights clause, explicitly reiterates that management rights are to be "construed strictly" and that Congress believed that such a construction would not impair management prerogatives. Infra 45-46. In addition, the dissent refers to an excerpt from the Conference Report, a statement pertaining to Sec. 7106(b)(1) which allows an agency at its discretion to bargain over the "number, types, and grades of employees or positions assigned." See H.R.Rep. 95-1717, 95th Cong., 2d. Sess. 153-54 (1978), reprinted in 1978 U.S.Code Cong. & Ad.News 2723, 2887-88. Section Sec. 7106(b)(1) of the Act, in addition to not being at issue in this case, does not alter the exception to the management rights clause contained in Sec. 7106(b)(2) the explicit language of which allows negotiation over procedures such as arbitration which may affect management rights.
 
 
 49
 The dissent fears that arbitration will unduly limit the efficiency of government operations, but given the extensive experience of employers with arbitration, it is highly unlikely that government contractors will be unable to take account of the costs of arbitration in their bids for work which government agencies choose to contract out. In any event, any dislocation that does result from negotiation over procedures governing contracting out decisions should be pointed out to the members of Congress who forged the Udall compromise which we are obligated to honor.*
 
 WILKINSON, Circuit Judge, dissenting:
 
 50
 OMB Circular A-76 states that it shall not "[e]stablish and shall not be construed to create any substantive or procedural basis for anyone to challenge any agency action or inaction ... except as specifically set forth" in the circular's own appeals provision. The Civil Service Reform Act reserves to agency management the exclusive right "to make determinations with respect to contracting out." 5 U.S.C. Sec. 7106(a)(2)(B). Although I applaud the acrobatics that the majority performs to avoid these provisions, I must nonetheless dissent.
 
 
 51
 Under the view enunciated by the majority, any written directives sent from the Office of Management and Budget to a federal agency, or indeed any directives sent from a superior to a subordinate within a single agency, would apparently form a basis for a labor grievance by federal employees. This result would follow even if the directive was explicitly stated not to create the basis for such a grievance, was concerned with an area reserved to agency management, and was not issued for the employees' protection or benefit. Such an interpretation is plainly inconsistent with the text of the Act and its underlying purposes.
 
 
 52
 The majority's disregard for the statute will hamper the operations of government. It will "divest management of the essence of its statutory authority to contract out" and lodge that authority in arbitrators. Defense Language Inst. v. FLRA, 767 F.2d 1398, 1401 (9th Cir.1985). It creates "a fertile source of weapons for obstructing or delaying contracting-out decisions, a situation Congress specifically sought to prevent." EEOC v. FLRA, 744 F.2d 842, 860 (D.C.Cir.1984) (MacKinnon, J., dissenting). It will add expense and subtract accountability throughout the Executive Branch, as decisions of agency managers bow to the protracted and uncertain course of arbitral review.
 
 
 53
 The majority justifies its disregard for the statute by pointing to speeches of individual members of the House, who stated that the management rights clause should be construed "narrowly." Evidently, the majority believes that Congress was thereby repudiating the broad language of the management rights clause that it was about to enact. As will be shown, the legislative history is equivocal at best. Even if one accepts the abstract canon of construction advanced by the majority, however, that still does not support its resolution of this particular case. By allowing third party review of agency decisions to contract out, the majority has not just construed the reserved rights in Sec. 7106 narrowly--it has construed them away altogether.
 
 
 54
 I would not enforce the Authority's order. The Authority itself has previously held that a union proposal to make violations of Circular A-76 grievable would intrude on management rights and hence is nonnegotiable. AFGE, Local 3403 and National Science Foundation, 6 F.L.R.A. 669, 674-75 (1981). The Authority based this decision on AFGE, Local 1968 and Department of Transportation, Saint Lawrence Seaway Development Corp., 5 F.L.R.A. 70 (1981), aff'd sub nom. AFGE, Local 1968 v. FLRA, 691 F.2d 565 (D.C.Cir.1982), cert. denied, 461 U.S. 926, 103 S.Ct. 2085, 77 L.Ed.2d 297 (1983). At some point, the Authority changed its position and was upheld by a divided panel of the District of Columbia Circuit in EEOC. The Ninth Circuit took a contrary view in Defense Language Institute.[1]
 
 
 55
 Part I of this dissent addresses the legal status of OMB circulars in general and of Circular A-76 in particular. Next, part II argues that the union's proposal is nonnegotiable under the Act even if the circular has the legal status that the majority ascribes to it. Finally, part III looks to the limited appeals procedure enacted by Congress and administered by the General Accounting Office, as well as the limited appeals procedure set forth in the circular, to argue that prompt resolution of contracting out disputes is essential and that this imperative would be thwarted by making labor arbitration an additional forum for such disputes.
 
 I.
 
 56
 The majority's holding today relies on an important but unsupported premise regarding the legal status of Circular A-76. Contrary to the premise of the majority, Circular A-76 is not a "law" in the sense of imposing external constraints or obligations upon the Executive Branch. It is an internal policy instruction from the President's managerial arm--the Office of Management and Budget--to the heads of federal departments.
 
 
 57
 We are told that the union's proposal to incorporate Circular A-76 into a collective bargaining agreement infringes no management right because the circular is already one of the agency's "existing legal and regulatory requirements." Maj. op. at 434. We are further told that an erroneous decision to contract out can be grieved even if Circular A-76 is not incorporated into an agreement, in part because the circular is a "law, rule, or regulation" under Sec. 7103(a)(9). Maj. op. at 437. Along the way, we are given the reassuring promise that arbitral decisions will be subject to review for compliance with "applicable laws." Maj. op. at 435.
 
 
 58
 These statements by the majority are all wrong. An agency's compliance with OMB Circular A-76 is adequate if and only if the President says it is. The circular explicitly commits its own enforcement to the Executive Branch, not to arbitrators or the judiciary. Moreover, enforcement of the circular is appropriately an internal function of the Executive Branch because applying the circular requires managerial discretion.[2]
 
 A.
 
 59
 "In carrying out its responsibilities, the Office of Management and Budget issues policy guidelines to Federal agencies to promote efficiency and uniformity in Government activities. These guidelines are normally in the form of circulars." 5 C.F.R. Sec. 1310.1. The circulars issued by OMB cover a variety of topics related to the administration of federal programs. See 5 C.F.R. Sec. 1310.5.
 
 
 60
 Circular A-76 is in the form of a letter from the director of OMB to "the heads of executive departments and establishments." It is accompanied by a four-part supplement that elaborates on the requirements of the circular. Most of the language of the circular is mandatory, and the supplement directs that compliance with it is mandatory. This fact does not mean, however, that the circular creates rights and obligations enforceable by third parties. The Executive Branch is permitted to promulgate internal orders for its own managerial purposes without leading to third party review. Local 2855, AFGE v. United States, 602 F.2d 574, 582 n. 28 (3d Cir.1979); Michigan v. Thomas, 805 F.2d 176, 187 (6th Cir.1986); Independent Meat Packers Ass'n v. Butz, 526 F.2d 228, 236 (8th Cir.1975). Cf. Schweiker v. Hansen, 450 U.S. 785, 789-90, 101 S.Ct. 1468, 1471-72, 67 L.Ed.2d 685 (1981). Another OMB circular, number A-107, was held by the D.C. Circuit to be such an order. In re Surface Mining Litigation, 627 F.2d 1346, 1357 (D.C.Cir.1980).
 
 
 61
 The language of Circular A-76 makes clear that it, too, is such an order. As noted at the beginning of this dissent, Circular A-76 provides that agency compliance can be reviewed only through the circular's own appeals procedure. OMB Circular A-76 at 4 (para. 7(c)(8)). The supplement, in setting out the appeals procedure, repeats the admonition from the circular: "The procedure does not authorize an appeal outside the agency or a judicial review." OMB Circular A-76 Supp. at I-14. And again:
 
 
 62
 Since the appeal procedure is intended to protect the rights of all directly affected parties--Federal employees and their representative organizations, and bidders or offerors on the instant solicitation--the procedure and the decision on appeal may not be subject to negotiation, arbitration, or agreement.
 
 
 63
 Id. at I-15 (emphasis added).
 
 
 64
 When the Executive Branch issued the circular, it was just telling heads of federal agencies what it wanted them to do. It was not creating a basis for grievances by federal employees. As one commentator has remarked:
 
 
 65
 To consider Circular A-76 an 'applicable law' will encourage the OMB and high-level agency management simply to stop providing policy guidance on contracting-out. If agency contracting officers at the lowest levels were merely delegated the authority to contract out in their sole discretion, no 'applicable laws' would exist to provide a basis for employee grievances. It is ludicrous to conclude that Congress intended ... to deny senior management officials that same discretion to determine uniform conditions for contracting out on an agency-wide basis.
 
 
 66
 Ketler, Federal Employee Challenges To Contracting Out: Is There A Viable Forum?, 111 Mil.L.Rev. 103, 139-40 (1986) (hereinafter cited as Challenges to Contracting Out ).
 
 B.
 
 67
 The present version of Circular A-76 was issued in 1983. A number of courts have considered whether the pre-1983 circular was amenable to third-party review. Every court addressing the question determined that the circular was not amenable to third-party review because it did not prescribe sufficiently detailed standards; it provided no "law" to apply. Rather, the steps prescribed by the circular required the exercise of managerial discretion. See AFGE, Local 2017 v. Brown, 680 F.2d 722, 726-27 (11th Cir.1982); Local 2855, AFGE v. United States, 602 F.2d 574, 581-83 (3d Cir.1979); AFGE v. Hoffmann, 427 F.Supp. 1048, 1073 (N.D.Ala.1976). The present circular, although more detailed than its predecessors, has essentially the same status. It provides few objective, nondiscretionary standards for review by third parties. It is above all a managerial document, and its enforcement is a matter for the Executive Branch.
 
 
 68
 In applying Circular A-76, a federal agency must begin by determining which of its activities are "governmental" and which are "commercial." Governmental functions are not contracted out; commercial ones might or might not be. The circular necessarily defines these two categories in open-ended terms:
 
 
 69
 A Governmental function is a function which is so intimately related to the public interest as to mandate performance by Government employees. These functions include those activities which require either the exercise of discretion in applying Government authority or the use of value judgment in making decisions for the Government.
 
 
 70
 OMB Circular A-76 at 2 (para. 6(e)).
 
 
 71
 In attachment A to the circular, which provides examples of commercial activities, agency management is cautioned to "use informed judgment on a case-by-case basis in making these decisions." Id. at 7. This reliance on agency discretion reappears, explicitly or implicitly, throughout the circular. For example, an agency can perform a commercial activity in-house if contracting out "would cause unacceptable delay or disruption of an essential program." Id. at 4 (para. 8(a)). The Secretary of Defense can exclude a commercial activity from contracting out "for national defense reasons." Id. (para. 8(b)). A government hospital can exclude an activity from contracting out "if the agency head, in consultation with the agency's chief medical director, determines that in-house performance would be in the best interest of direct patient care." Id. at 5 (para. 8(c)).
 
 
 72
 The supplement accompanying Circular A-76 also reflects this approach. Part I, "Policy Implementation," provides general instructions and flowcharts on how to comply with the circular. Most of the steps prescribed, however, involve the open-ended inquiries discussed above: e.g., whether the activity is a governmental function, whether in-house performance is required for national defense, and so on.
 
 
 73
 Part II, "Writing and Administering Performance Work Statements," explains how agency management will ascertain and describe just what the particular activity is--in other words, what must be done and what standards will be used to measure it. This inquiry, too, requires the exercise of agency discretion.
 
 
 74
 Part III, "Management Study Guide," suggests ways for agency management to study its organization to get the most efficient in-house performance of the activity. It states that it "does not purport to replace the agencies [sic] own management techniques." OMB Circular A-76 Supp. at III-1. It further states that
 
 
 75
 [s]pecific techniques used ... can range the entire spectrum of work measurement, value engineering, methods improvement, organizational analysis, position management and systems and procedures analysis.... The techniques chosen depend on the type of function involved and the data, time and analysts available.
 
 
 76
 Id. at III-3.
 
 
 77
 Part IV, "Cost Comparison Handbook," explains how to compare the cost of performing an activity in-house with the cost of contracting out. This part of the supplement does provide specific, detailed instructions for management to follow. Even here, however, managerial discretion is important. For example, to determine the in-house cost, the agency must prepare an "in-house staffing estimate"--that is, an estimate of the number and types of people needed for the activity. "A variety of tools may be used to determine the in-house staffing estimate. These tools include manpower standards, staffing guides, prior experience, similar operations at other locations, actual work measurement and informed judgment." Id. at IV-7.
 
 
 78
 The majority apparently views the circular as somewhat akin to a mathematical formula which, when correctly followed, will yield one correct result. The circular itself belies this view. Much of the circular calls for managerial judgment. Further, as the above example suggests, the line between the discretionary and nondiscretionary aspects of the circular will often be shadowy. Thus, as with the pre-1983 versions of the circular, "decisions made ... under Circular A-76 are committed to agency discretion." AFGE, Local 2017, 680 F.2d at 726.
 
 C.
 
 79
 The Authority contends that arbitral review of contracting out will not infringe managerial prerogatives because arbitrators will be permitted to review only those grievances based on nondiscretionary parts of the circular. It refers to its earlier decision in Headquarters, 97th Combat Support Group (SAC), Blytheville AFB and AFGE, Local 2840, 22 F.L.R.A. No. 72 (1986), in which it enunciated this limitation on arbitral review. The Authority's actual order in that case, however, illustrates the difficulties in trying to segregate discretionary and nondiscretionary parts of the circular. Another recent decision of the Authority, U.S. Army Engineer District and AFGE, Local 3838, 26 F.L.R.A. No. 49 (1987), also serves to underscore the point.
 
 
 80
 In Blytheville AFB, the Air Force decided to contract out the maintenance of some aircraft. The union filed a grievance and was upheld by an arbitrator. The Authority agreed and ordered the Air Force to reconstruct the procurement action. One of the grounds upheld by the arbitrator and the Authority was that the Air Force's cost comparison provided for the upgrading of a job position. By upgrading the job position, the Air Force improperly increased the in-house cost estimate. Here, the arbitrator was applying the mandatory rule that in-house estimates be based on the most efficient organization, but at the same time the arbitrator was second-guessing a managerial decision. The arbitrator apparently ignored or disagreed with "the equally reasonable conclusion that, especially with regard to temporary work, a position staffed at a higher grade level might result in greater efficiency by attracting a higher quality employee than would a lower-graded position." Challenges to Contracting Out at 147.
 
 
 81
 In U.S. Army Engineer District, the Army decided to contract out the operation of four sewage treatment plants. The Authority upheld the arbitrator's decision in favor of the union and ordered the action reconstructed. The arbitrator found the Army in violation of the rule that the circular "shall not ... [b]e used to justify conversion to contract solely to avoid personnel ceilings or salary limitations." OMB Circular A-76 at 3 (para. 7(c)(6)). According to the arbitrator, the Army had contracted out to avoid personnel ceilings. Here again, the arbitrator was applying a mandatory rule, but he could do so only by second-guessing management as to the real motives behind its decision.
 
 
 82
 Although I offer these examples to suggest the practical difficulties of the Authority's position regarding Circular A-76, I want to emphasize that my objections do not center on practicality. Viewing Circular A-76 as a "law" that creates obligations enforceable by third parties is wrong in principle, both because Circular A-76 is explicitly an internal order committed to the Executive Branch for enforcement and because it requires the managerial discretion of the Executive Branch to be applied in the first place.
 
 II.
 
 83
 Even if we assume that Circular A-76 is a requirement of law with which an agency already must comply, and that the circular provides adequate standards for decision by a court or an arbitrator, the majority's position is still incorrect. The management rights clause of the Act reserves for management the exclusive right to decide whether work is to be contracted out. See 5 U.S.C. Sec. 7106(a)(2)(B). Arbitral review of management's compliance with the circular would contravene the Act's strict rule that "nothing in this chapter shall affect the authority of any management official" to decide matters enumerated in the management rights clause.
 
 
 84
 I cannot accept the majority's attempt to reconcile the union's proposal with the Act's seemingly unequivocal management rights clause. Nor do I subscribe to the majority's contention that violations of the circular can be grieved even if the circular is not incorporated into a collective bargaining agreement.
 
 A.
 
 85
 The majority contends that the union's proposal is procedural, rather than substantive, so it is outside the prohibition of Sec. 7106(a). Turning first to the Act's language, the majority correctly notes that Sec. 7106(a) is "subject to" Sec. 7106(b)(2), which provides in turn that "[n]othing in this section shall preclude any agency and any labor organization from negotiating ... procedures which management officials of the agency will observe in exercising any authority under this section." The majority then states that the agency has conceded the union's proposal to be procedural--a "concession" that appears nowhere in the agency's briefs.
 
 
 86
 Judge MacKinnon, dissenting in EEOC, observed that "the Circular and its accompanying Supplement are designed to offer guidance to agencies in making the decision to contract out--i.e., to provide substantive policy-making criteria--not procedures for carrying out decisions already made." 744 F.2d at 855. This is surely correct. A union and an agency might well negotiate about the procedures that will be followed, once a decision to contract out has been made, for the protection of affected employees. The actual decision to contract out, however, is inherently substantive and reserved to management. See Challenges to Contracting Out at 129-30.
 
 
 87
 Circular A-76 is unquestionably a "procedure" in the sense that it instructs management to do one thing, then another, then another. That does not make it negotiable as a procedure that management will observe in exercising its authority. To take this expansive view of Sec. 7106(b)(2) would wipe out the management rights clause entirely, as every management decision-making process would become a negotiable procedure. Moreover, if Congress intended for Sec. 7106(b)(2) to allow arbitration of managerial decisions such as the decision to contract out, then it was nonsensical for Congress in Sec. 7106(b)(1) to allow negotiation "on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project, or tour of duty" to take place "at the election of the agency " (emphasis supplied).
 
 
 88
 To support its interpretation, the majority quotes from speeches of two individual members of the House for the proposition that reserved management rights should be construed narrowly. In doing so, the majority perpetuates an unfortunate judicial custom: quoting snippets of legislative history to overcome disagreeable statutory language while ignoring any legislative history that goes the other way. For example, Representative Morris Udall--from whom the majority draws its "canon of construction"--stated that the bill "moves to meet some of the legitimate concerns of the Federal employee unions as an integral part of what is basically a bill to give management the power to manage and the flexibility that it needs." (Emphasis added.) Representative Udall went on to explain:
 
 
 89
 We are saying to the federal employees that we are going to give management some broad new rights here in this legislation, we are going to enable them to move. And employee organizations are saying, in turn, that they are entitled to have a more independent, secure position from which to deal with management as it operates under this new freedom in the bill.
 
 
 90
 124 Cong.Rec. H9633 (Sept. 13, 1978), reprinted in Subcomm. on Postal Personnel and Modernization, Comm. on Post Office and Civil Service, 96th Cong., 1st Sess., Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978 (Comm. Print 1979) at 923. (Hereinafter cited as Legislative History.)
 
 
 91
 Incidentally, Congress is not a unicameral body. The majority entirely ignores the Senate. The conference report on the bill, which gives the joint explanatory statement of the House and Senate managers, does not call for a narrow construction of management rights. On the contrary, the conferees' extended discussion of Sec. 7106(b)(1) indicates that they were very much concerned about protecting managerial prerogatives from mandatory bargaining. "The conferees wish to emphasize ... that nothing in the bill is intended to require that an agency negotiate on the methods and means by which agency operations are to be conducted." H.R.Rep. 95-1717, 95th Cong., 2d Sess. 153-54 (1978), reprinted in 1978 U.S. Code Cong. & Ad. News 2723, 2887-88 and in Legislative History at 793, 821-22. The concurrence seeks to dismiss this discussion in the conference report by suggesting that it was limited to Sec. 7106(b)(1), but in fact the conferees stated that "nothing in the bill " was to allow intrusions on agency decisionmaking under the management rights clause.[3]
 
 
 92
 Moreover, Representative William D. Ford, another of the majority's star witnesses, indicated that his "narrow" view of the respective roles of management rights and negotiated procedures was much like the view presented here:
 
 
 93
 It is our expectation and that of others supporting the substitute's management rights clause that such a clause will adequately protect genuine managerial prerogatives but that, construed strictly, such a clause will also allow the flexibility that is the hallmark of a successful labor-management program. Thus, although management has the right to direct the workforce, proposals aimed at lessening the adverse impact on employees of an exercise, perhaps arbitrary, of that right are fully negotiable.
 
 
 94
 124 Cong.Rec. 29199 (1978), reprinted in Legislative History at 956 (emphasis added).
 
 
 95
 After its foray into the legislative history of the Act, the majority offers several further arguments in support of its position. First, the proposal is not substantive because an arbitrator cannot rule on a matter reserved to management's discretion. Second, even if arbitrators do make substantive decisions, the Executive Branch can override those decisions by amending the circular. Third, an erroneous decision by an arbitrator will be subject to judicial review.
 
 
 96
 These arguments disregard the inherently substantive and managerial nature of the decision to contract out; any ruling by an arbitrator in this area infringes management rights. They also disregard the fact that Sec. 7123(a)(1) permits no judicial review of an arbitrator's decision unless it involves an unfair labor practice. AFGE, Local 1923 v. FLRA, 675 F.2d 612 (4th Cir.1982). A violation of the circular would appear not to fall within the unfair labor practices listed in Sec. 7116(a). Thus, despite the majority's assurances, an arbitral decision that applied Circular A-76 erroneously would not be subject to judicial review.[4]
 
 
 97
 The majority's suggestion that the Executive Branch amend the circular to correct erroneous arbitration decisions raises a further question. Suppose the Authority has been permitting arbitrators to rule on a matter reserved to managerial discretion because the Authority understands the matter to be nondiscretionary and hence within the scope of arbitral authority. It is difficult to say what the Executive Branch could put in its circular to change the Authority's decision. The label given a matter in the circular would presumably not govern. That is, it would not be enough for the circular to state, "This matter is discretionary; arbitrators should quit deciding it."
 
 
 98
 It appears that the majority would not allow the Executive Branch to limit the grievability of the circular in this way. The majority holds, in part III-C of its opinion, that it will not give effect to the statement already in the circular through which the Executive Branch tried to establish an exclusive appeals process. The majority holds that agencies cannot "limit by regulation the statutorily defined grievance procedure of section 7121." Maj. op. at 439. I am therefore at a loss to see what the Executive Branch could write to keep a part of the circular off limits to arbitrators. At any rate, the majority's view imposes a burden on the Executive Branch which it should not have and which it does not have under the Act.
 
 B.
 
 99
 Perhaps the most curious aspect of this litigation is that the Authority is seeking to uphold the negotiability of a proposal that the Authority contends to be without any effect. According to the Authority, agency employees can seek review of an alleged violation of Circular A-76 even if the union's proposal is not adopted. The majority upholds this view in part III-B of its opinion, which apparently renders the rest of its opinion mere dicta. Contrary to the majority's interpretation, the management rights clause bars such grievances whether they are based on a violation of a labor agreement or directly on a violation of the circular.
 
 
 100
 Under the majority's interpretation, the management rights clause limits only the duty to bargain set forth in Sec. 7117; it does not limit the grievance procedures set forth in Sec. 7121. The majority acknowledges a difficulty with this interpretation--i.e., it contradicts the command of the management rights clause that "nothing in this chapter shall affect" the exercise of reserved rights. To avoid this difficulty, the majority purports to find a conflict between the management rights clause and Sec. 7121. It notes that Sec. 7121(a) requires labor agreements to provide grievance procedures "[e]xcept as provided in paragraph (2) of this subsection." It then suggests that the failure of Sec. 7121 in this passage to refer to Sec. 7106, the management rights clause, implicitly removes Sec. 7121 from the scope of Sec. 7106.
 
 
 101
 This "conflict" is spurious on its face. A similar version of the quoted passage from Sec. 7121(a) also appears in Sec. 7117(a). Thus, if that language has the significance suggested by the majority, then the management rights clause limits neither grievance procedures nor the duty to bargain. In other words, it limits nothing. There is clearly something wrong here. The obvious solution is to read "nothing in this chapter" as meaning what it says--i.e., that nothing in 5 U.S.C. Secs. 7101-35, including both the grievance procedures and the duty to bargain, can affect management's exercise of its reserved rights. See Defense Language Institute, 767 F.2d at 1402; EEOC, 744 F.2d at 857 (MacKinnon, J., dissenting).
 
 
 102
 After drumming up a nonexistent ambiguity in the statute, the majority looks next to the legislative history. This history again relies principally on the statements of two members of the House. The quoted statement of Representative Ford was made on October 14, 1978, after the Act was signed into law. Not surprisingly, reliance on these post-enactment comments by Representative Ford has been rejected by the D.C. Circuit. AFGE, Local 225 v. FLRA, 712 F.2d 640, 647 & n. 29 (D.C.Cir.1983). In any event, the statements of the House members are fully consistent with the view of the management rights clause given in part II-A of this dissent; they note simply that the Act expressly provides for the negotiation of procedures by which management will exercise a reserved right. They are not saying that the management rights clause applies unequally to Sec. 7117 and Sec. 7121. The same is true of the Supreme Court case cited by the majority in footnote 15. Cornelius v. Nutt, 472 U.S. 648, 652, 105 S.Ct. 2882, 2885, 86 L.Ed.2d 515 (1985).
 
 
 103
 The majority also contends that the Act must be construed against the background of the previous labor policy under Executive Order 11491. On this score, the 1971 report of the Federal Labor Relations Council cited by the majority does not at all support the majority's view of management rights under the Executive Order. Even if it did, however, it would provide no authoritative guidance in the construction of the 1978 Act. The Act is not to be construed as a reenactment of the Executive Order; it is "part of a comprehensive revision of the laws governing the rights and obligations of civil servants." Bureau of Alcohol, Tobacco & Firearms v. FLRA, 464 U.S. 89, 91, 104 S.Ct. 439, 441, 78 L.Ed.2d 195 (1983). See also id. at 103 n. 13, 104 S.Ct. at 447 n. 13.
 
 
 104
 At various points, the majority states that the phrase "in accordance with applicable laws" in Sec. 7106(a) encompasses Circular A-76 and at other points that it permits employees to file grievances about any decision reserved to management. I have argued that the phrase has neither effect. It may be helpful, at this point, to define the limitation that the phrase does impose on management rights. The scope of this limitation is evident from the structure of Sec. 7106(a) itself. Of the two parts of Sec. 7106(a), one is limited by "in accordance with applicable laws" and one is not. The first, Sec. 7106(a)(1), concerns the "mission, budget, organization, number of employees, and internal security practices of the agency." The second, Sec. 7106(a)(2), concerns a large number of matters, most of them pertaining to the status of individual employees. These include managerial decisions to hire, suspend, discipline, and assign employees.
 
 
 105
 Congress presumably did not mean to imply that management was free to make Sec. 7106(a)(1) decisions in a completely lawless fashion. What it evidently meant by the distinction is that, in the words of one commentator, " 'applicable laws' in section 7106(a) refers to statutes prescribing employee rights and benefits--particularly procedural rights in conjunction with adverse personnel actions." Challenges to Contracting Out at 138. In other words, an agency cannot invoke the management rights clause to bar Sec. 7121 grievances concerning matters such as prohibited personnel practices (Sec. 2302), job performance ratings (Sec. 4303), and adverse personnel actions (Sec. 7512). The phrase "applicable laws" does not, however, permit federal employees to grieve unrelated violations of the law, such as an agency's alleged violation of its budgetary limit, its statutory mission, or the environmental laws. It also does not permit federal employees to grieve violations of Circular A-76.
 
 III.
 
 106
 The Act makes clear that Congress did not intend for labor arbitrators to review contracting out decisions. The majority has not just miscontrued the text of the Act, however; it has also disregarded the policies underlying it. For the government to operate efficiently, disputes about contracting out must be resolved by a body with expertise in the area. These policies are evident in the expedited contract appeals procedure created by Congress in the Competition in Contracting Act of 1984, 31 U.S.C. Secs. 3551-56. They are also evident in the expedited appeals procedure set forth by the Executive Branch in Circular A-76 itself. Both the Competition in Contracting Act and Circular A-76 provide for swift, competent resolution of these disputes. The labor grievance process, while appropriate for resolving the disputes that Congress has entrusted to it, should not be extended to encompass contracting out decisions.
 
 
 107
 Under the procurement protest system established in the Competition in Contracting Act, the U.S. General Accounting Office (GAO) can resolve disputes about government procurements, including decisions to contract out. Within one working day after the GAO receives a protest, it must notify the federal agency involved. 31 U.S.C. Sec. 3553(b)(1). The agency is then required to respond with a report about the matter within 25 days or to request permission for a longer period. 31 U.S.C. Sec. 3553(b)(2). The GAO must normally issue a final decision regarding the protest within 90 days after receiving the protest. 31 U.S.C. Sec. 3554(a)(1). Likewise, under the appeals procedure in the circular, a protest must be received by the agency within 15 working days after the agency releases the documents supporting its cost comparison; if the cost comparison is especially complex, the agency may extend this limit to 30 days. OMB Circular A-76 Supp. at I-15. The circular requires that the appeals procedure provide a decision within 30 calendar days after receipt of the protest. Id. at I-14.
 
 
 108
 In contrast, labor arbitration of contracting disputes can take years. See Challenges to Contracting Out at 141 n. 182. The Blytheville Air Force Base arbitration, discussed in part I-C of this dissent, is an example. Final bids in that case were submitted by March 11, 1982. Id. at 163. The Authority announced its decision reviewing the arbitrator's award on July 23, 1986, over four years later.
 
 
 109
 It is thus no surprise that Congress and the Executive Branch wanted to avert labor arbitration of contracting out decisions. "Prompt resolution of government procurement appeals is imperative. Funds must be obligated, if at all, during the fiscal year for which they are appropriated, and undue delay in implementing either a contract award or in-house ... plan may, because of rapidly changing economic conditions, invalidate the original cost comparison." Id. at 117 (footnote omitted).
 
 
 110
 The delay and uncertainty of arbitral review may also cause some firms not to bid on government projects, while others will incorporate the cost of arbitral uncertainty into the contract price. Contractors must commit personnel and other resources to a government project when they receive a contract. Under the majority's view, however, they face the possibility that the agency's decision to contract out could be found infirm by a labor arbitrator years after the contract has been in effect. On the other hand, the circular's appeals procedure merely requires a prospective contractor to extend the bid acceptance period for up to sixty days to cover the appeal period before a contract is finally awarded. OMB Circular A-76 Supp. at IV-3.
 
 
 111
 Even under the expedited conditions required by the Competition in Contracting Act, the GAO is given only the power to make recommendations and to report to Congress if its recommendations are not followed. 31 U.S.C. Sec. 3554; Delta Data Systems Corp. v. Webster, 744 F.2d 197, 201 (D.C.Cir.1984); see also Ameron, Inc. v. U.S. Army Corps of Engineers, 809 F.2d 979, 994 (3d Cir.1986). Although its recommendations are no doubt given great deference by federal agencies, the GAO does not have the power under the Act to order reconstruction of a decision to contract out. A labor arbitrator's decision, in contrast, would be binding.
 
 
 112
 Furthermore, the Supreme Court has recognized that "the specialized competence of arbitrators pertains primarily to the law of the shop." Alexander v. Gardner-Denver Co., 415 U.S. 36, 57, 94 S.Ct. 1011, 1024, 39 L.Ed.2d 147 (1974). The specialized competence of arbitrators and the Authority does not extend to contracting out.
 
 
 113
 The GAO is uniquely qualified to make determinations regarding contracting out protests. Management-labor disputes over contracting out should be removed from the realm of collective bargaining agreements, arbitrations, FLRA decisions, and 'conflicting' federal court decisions. The latter approach has only produced chaos and inconsistent reasoning from a multitude of forums--none of which possess the GAO's congressionally mandated authority and recognized expertise in settling government procurement-related protests.
 
 
 114
 Catania, Contracting Out: Management and Labor at War Under Section 7106 of the Civil Service Reform Act, 16 Public Contract L.J. 287, 295-96 (1986); see also Challenges to Contracting Out at 165.
 
 
 115
 It has been suggested that the Competition in Contracting Act should be amended by Congress to permit federal employees as well as prospective contractors to lodge procurement protests with the GAO. See Catania, supra, at 296; Challenges to Contracting Out at 164-66. That is for Congress to decide. Our judicial role does not empower us to effect a more drastic result by repealing the management rights clause of the Civil Service Reform Act.
 
 
 116
 I respectfully dissent.
 
 
 
 [1]
 OMB Circular A-76 sets guidelines for determining whether necessary goods and services should be obtained from the private sector or acquired "in house" from government facilities and personnel. Generally, government agencies acquire goods from the private sector when comparative cost analysis indicates that it would be cost effective to do so. The Circular is supplemented by a Cost Comparison Handbook outlining procedures to be used in making the decision whether or not to contract out. 44 Fed.Reg. 20556 (1979) as amended by 45 Fed.Reg. 69322 (1980); 47 Fed.Reg. 6511 (1982); id. at 46783; 48 Fed.Reg. 37110 (1983); 50 Fed.Reg. 32812 (1985)
 
 
 [2]
 5 U.S.C. Sec. 7123(a) provides that "[a]ny person aggrieved by any final order of the Authority ... may ... institute an action for judicial review of the Authority's order ... in the United States court of appeals in the circuit in which the person resides or transacts business." The Authority may petition any appropriate United States court of appeals for enforcement of any of its orders. 5 U.S.C. Sec. 7123(b)
 At first blush, it appears that there is no case or controversy. HHS has indicated that it will adhere to the guidelines of the Circular whether or not the Union's proposal is adopted as part of the collective bargaining agreement between HHS and the Union. HHS and the FLRA do argue over the proposal's negotiability, however. HHS contends that adoption of the Union's proposal would, for the first time, subject disputes relating to management's decisions to contract-out work to the Act's grievance procedures and is therefore nonnegotiable as an infringement on management's reserved authority. The FLRA, on the other hand, contends that such grievances have always been subject to the Act's grievance procedures. One of the purposes of the Act is to encourage negotiation over prospective as well as current problems. Agreement as to how particular problems will be handled prior to their occurrence greatly reduces conflict in the event such problems do arise. The fact that there is no current controversy concerning a specific contracting-out decision does not mean this court lacks jurisdiction to determine the proposal's negotiability. Whether management has a duty to bargain under the Act over a particular proposal is a controversy in and of itself over which this court has jurisdiction. The cases which have found that jurisdiction exists to determine the negotiability of a specific proposal are legion. See, e.g., Defense Language Institute v. FLRA, 767 F.2d 1398 (9th Cir.1985), cert. dismissed, --- U.S. ----, 106 S.Ct. 2004, 90 L.Ed.2d 647 (1986) (proposal requiring adherence to OMB Circular A-76 held nonnegotiable); EEOC v. FLRA, 744 F.2d 842 (D.C.Cir.1984), cert. dismissed, --- U.S. ----, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986) (proposal requiring adherence to OMB Circular A-76 held negotiable); see also, American Federation of Government Employees, Local 1931 v. FLRA, 802 F.2d 1159 (9th Cir.1986) (management's policy of expeditious suspension of driving privileges held to be a nonnegotiable internal security practice); Department of Health and Human Services, Social Security Administration v. FLRA, 791 F.2d 324 (4th Cir.1986) (union proposal held nonnegotiable because it would violate SSA's right to assign work); Association of Civilian Technicians v. FLRA, 780 F.2d 12 (7th Cir.1985) (proposal relating to requirement that civilian technicians wear military uniforms while performing their nonmilitary duties is nonnegotiable); United States Department of Justice, Immigration and Naturalization Service v. FLRA, 709 F.2d 724 (D.C.Cir.1983) (proposal to bring probationary employees within mandatory grievance procedure held nonnegotiable); State of Nebraska Military Dept., Office of the Adjutant General v. FLRA, 705 F.2d 945 (8th Cir.1983) (proposals for grievance procedures culminating in binding arbitration found nonnegotiable because in conflict with the National Guard Technicians Act).
 
 
 [3]
 Section 7106 provides in pertinent part:
 (a) Subject to subsection (b) of this section, nothing in this chapter shall affect the authority of any management official of any agency--
 ....
 (2) In accordance with applicable laws--
 ....
 (B) to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted:
 ....
 (b) Nothing in this section shall preclude any agency and any labor organization from negotiating--
 ....
 (2) procedures which management officials of the agency will observe in exercising any authority under this section;
 ....
 5 U.S.C. Secs. 7106(a)(2)(B), (b)(2).
 
 
 [4]
 HHS assumes that if the Union's proposal is not adopted then arbitral review under the Act of management's compliance with the Circular would be unavailable. As shown in Part B infra, however, HHS's contracting-out decisions are subject to arbitral review regardless of whether the Union's proposal is adopted
 
 
 [5]
 Our dissenting brother suggests that "an arbitral decision that applied Circular A-76 erroneously would not be subject to judicial review" because no unfair labor practice would be involved, as required by Sec. 7123(a)(1). (Dissent, op. at 445-446). The dissent has overlooked the impact of decisions to contract out. The practical effect of such decisions is the shifting of work to the nonunion sector from union employees. As a result, challenges to contracting out decisions will typically be accompanied by unfair labor practice charges of antiunion discrimination. See 5 U.S.C. Secs. 7116(a)(1), (2) and 7123(a)(1). Therefore, arbitral decisions erroneously applying Circular A-76 will almost always be subject to judicial review
 
 
 [6]
 The management rights clause which appears in the Act was adopted as an amendment on the House floor to the clause reported by the House Committee on Post Office and Civil Service. The Udall compromise rejected the version of the bill reported by the Senate which simply codified the existing practices and decisions under existing Executive Order 11491. S.Rep. No. 95-969, 95th Cong., 2d Sess. (1978), U.S.Code Cong. & Admin.News 1978, p. 2723, reprinted in House of Representatives Committee on Post Office and Civil Service, 96th Cong., 1st Sess., Legislative History of the Civil Service Reform Act of 1978 (hereinafter cited as Legislative History) at 1476. The amendment adopted on the House floor was adopted by the House-Senate Conference Committee without change. H.R.Rep. No. 95-1717, 95th Cong., 2d Sess. 153-54 (1978) (Conference Report), U.S.Code Cong. & Admin.News 1978, p. 2723, reprinted in Legislative History at 1995, 96
 
 
 [7]
 The Federal Labor Relations Council, which interpreted the Executive Order previously governing federal labor management relations, had broadly construed the management rights protected by that order. See 124 Cong.Rec. H-9638 (1978), reprinted in Legislative History at 1058-59 (Statement of Rep. Udall) (Council has departed from the canon of construction that management rights should be interpreted narrowly); Id., at 1078-79 (Statement of Rep. Ford) (Council has interpreted the management rights clause too broadly)
 
 
 [8]
 Id. at 1058 (Statement of Rep. Udall) ("Title VII is remedial legislation designed to cure the problems caused primarily by the Council's misinterpretation of the Executive Order"); Id., at 1081 (Statement of Rep. Ford) ("Title VII itself is remedial legislation and those supporting the Udall change in the management rights clause continue to fully intend Title VII to be broadly construed to achieve these remedial objectives of favoring collective bargaining")
 
 
 [9]
 See Id. at 1085 (Statement of Rep. Ford) (Sec. 7135's "superseded language is intentionally included to make clear that the new authority, acting under its own statutory charter, is not to repeat past mistakes in the area of labor management relations. Title VII, as a whole, and the management rights clause in particular, mandates (sic) a new approach to labor relations in the Federal government")
 
 
 [10]
 See also Id. at 1080 (Statement of Rep. Ford) (Adoption of a narrow construction of the management rights provision "is an essential element in our working out the Udall compromise")
 
 
 [11]
 The remarks of Representative Ford, a member of the conference committee, explaining the final bill were endorsed by several other members of the conference committee. 124 Cong.Rec. E 5724 reprinted in Legislative History, at 2015 (statement of Rep. Clay); Id., at 2016 (statement of Rep. Schroeder)
 
 
 [12]
 Judges must be honest agents of the political branches. They carry out decisions they do not make ... [G]ood judges make it easier for the political branches to strike compromises, to enact new laws ... Judges' claim to authority rests on a plausible demonstration that they are faithfully executing decisions made by others. The consequence of honest and capable discharge of that function may be more rent-seeking legislation, or it may be more general interest legislation ... which occurs is not the judges' affair
 Easterbrook, The Supreme Court, 1983 Term-Forward: The Court and the Economic System, 98 Harv.L.Rev. 4, 60 (1984).
 
 
 [13]
 The only way to resolve the conflict between sections 7106 and 7121 of the Act, while at the same time preserving the entire statute, is to classify arbitration as a section 7106(b)(2) negotiable procedure
 
 
 [14]
 AT & T Technologies v. Communication Workers of America, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)
 
 
 [15]
 Court decisions interpreting the Act have consistently concluded that management functions which are nonnegotiable under the Act may be subject to arbitration under Sec. 7121. See Cornelius v. Nutt, 472 U.S. 648, 105 S.Ct. 2882, 86 L.Ed.2d 515 (1985) (nonnegotiable disciplinary actions are subject to statutory grievance procedures); Andrade v. Lauer, 729 F.2d 1475, 1484-89 (D.C.Cir.1984) (nonnegotiable reduction-in-force rules and regulations are subject to statutory grievance procedures)
 
 
 [16]
 "Other provisions" includes section 7121 which established the Act's grievance mechanism
 
 
 [17]
 The Act itself shows that Congress intended disputes concerning the exercise of management rights to be grieved under the provisions of the Act. The authority to take disciplinary action is a reserved management right listed in section 7106(a)(2)(A) which was excluded from the Act's grievance procedure by section 7121(c)(3). The exemption for complaints concerning disciplinary action would have been unnecessary if Congress believed that complaints concerning the exercise of a nonnegotiable management right were not subject to the Act's grievance procedures
 
 
 [18]
 The Circular itself indicates that it will not apply when it is in conflict with a statute: "This Circular and its Supplement shall not: (1) Be applicable when contrary to law...." 48 Fed.Reg. 37110 at p 7(c)(1) (1983)
 
 
 [19]
 Our dissenting brother suggests that we should adhere strictly to the language of Sec. 7106 regarding contracting out decisions but ignore the command of Sec. 7123(c) that we may not consider on appeal an issue not raised before the FLRA. (Dissent op. at 443, n. 2). Section 7123(c) unambiguously forbids us from considering the issue of whether Circular A-76 is an applicable law within the meaning of Sec. 7106 because HHS failed to raise the issue before the FLRA in a timely fashion. Nonetheless the dissent suggests that the FLRA should have rendered an advisory opinion on the subject because of the Supreme Court's concern over the issue or because it is entitled to waive its timeliness requirements in exceptional circumstances pursuant to 5 C.F.R. Sec. 2429.23(b). The FLRA declined to render such an opinion because no party before it suggested that the issue should be considered and because there were no exceptional circumstances justifying the agency's failure to raise it. Even if the FLRA's decision to leave the issue for another day was ill considered, the dissent still fails to explain how we may reach the issue when there is no suggestion that the FLRA exceeded its legal authority in declining to consider it
 
 
 *
 See, generally, Easterbrook, The Court and the Economic System, 98 Harv.L.Rev. 4 (1984); Posner, Economics, Politics, and the Reading of Statutes and the Constitution, 49 U.Chic.L.Rev. 263 (1982)
 
 
 [1]
 Although the issue in these cases is the negotiability of the union's proposal, the Act provides for bargaining impasses to be resolved by the Federal Service Impasses Panel, which can order the adoption of a negotiable bargaining proposal. 5 U.S.C. Sec. 7119. Thus, even if the agency does not consent to incorporate Circular A-76 into a labor contract, the Panel can still order the union proposal to be adopted. In that event, employees would have the right to file grievances claiming that the bargaining agreement was breached on the ground that the circular was allegedly violated
 All this is in addition to the majority's far-reaching holding, in part III-C of its opinion, that decisions to contract out can be grieved whether the circular is part of a labor agreement or not.
 
 
 [2]
 The majority argues in part III-D of its opinion that we are barred from considering whether the circular is a law, rule, or regulation because the agency failed to raise this question before the Authority. It cites the Supreme Court's dismissal of certiorari in EEOC to support this view. The application of EEOC is hardly so clear-cut as the majority indicates, however
 First, the agency did present the issue to the Authority in its motion for reconsideration. Although the motion was filed outside the ten day period prescribed by the Authority in 5 C.F.R. Sec. 2429.17, the Authority could have waived the expired time limit pursuant to 5 C.F.R. Sec. 2429.23(b). For some reason, despite the fact that the grievability of violations of the circular had already been the subject of two conflicting opinions by the courts of appeals and a grant of certiorari by the Supreme Court, the Authority refused to waive the time limit.
 Second, as the Court noted in EEOC, the procedural default rule reflects "an intent that the FLRA shall pass upon issues arising under the Act, thereby bringing its expertise to bear on the resolution of those issues." 106 S.Ct. at 1680. Here, although the agency failed to present the issue until its motion for reconsideration, the Authority was fully apprised of the issue by the previous litigation surrounding it. While the agency's failure to raise the status of the circular in a timely manner is unfortunate, I have difficulty understanding why the Authority would not address it when the Supreme Court has already dismissed certiorari to await development of the Authority's views.
 Finally, the Court based its decision in EEOC partly on the fact that the question was raised before neither the Authority nor the court of appeals. 106 S.Ct. at 1681. Here, the agency has briefed the issue for us. That alone might not adequately distinguish EEOC, for the Court based its decision principally on the statutory bar of Sec. 7123(c). This factor is still pertinent, however. The legal status of Circular A-76 is not strictly a matter within the special competence of the Authority to decide in the first instance. In today's case, unlike EEOC, the issue has been properly and timely presented to the court of appeals, which is no less competent than the Authority to decide it. Cf. National Black Media Coalition v. FCC, 791 F.2d 1016, 1021 (2d Cir.1986); Railroad Yardmasters of America v. Harris, 721 F.2d 1332, 1337-38 (D.C.Cir.1983).
 
 
 [3]
 An additional word about the concurring opinion may be in order. Although the concurrence purports to be construing Secs. 7106(a) and 7106(b)(2), it diligently avoids quoting those provisions. Its reluctance to do so is understandable. Contrary to the majority's and the concurrence's view that management rights must be construed narrowly, the language of the management rights clause is sweeping
 Like the majority opinion, the concurrence mainly focuses on the "Udall compromise" in the House. The real question, of course, is just what effect that compromise had. Absolutely nothing in the House legislative history, including those portions cited by the majority and the concurrence, states that the compromise requires negotiation and arbitration of agency decisions to contract out. The Act itself--in which the compromise was embodied--compels the opposite conclusion.
 
 
 [4]
 In fact, the courts of appeals have consistently held that an arbitrator's decision is not subject to judicial review unless an unfair labor practice was a necessary ground for the decision. See U.S. Department of Justice v. FLRA, 792 F.2d 25 (2d Cir.1986); U.S. Marshals Service v. FLRA, 708 F.2d 1417 (9th Cir.1983); Tonetti v. FLRA, 776 F.2d 929 (11th Cir.1985). Even if a violation of Circular A-76 amounted to an unfair labor practice, then, no judicial review would be available. Under the majority's view, an unfair labor practice would never be a necessary ground for an arbitrator's decision concerning the circular, because the majority believes that a violation of the circular is always grievable as a violation of a law, rule, or regulation whether it amounts to an unfair labor practice or not
 The presence of a cross-appeal for enforcement under Sec. 7123(b) apparently does not confer jurisdiction on the courts to review an arbitrator's decision, either. See U.S. Department of Justice, supra.